IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| PETROLEUM PRODUCTS & | § | CASE NO. 16-31201-H1-11 |
| SERVICES, INC. | § | |
| | § | Judge Marvin Isgur |
| Debtor. | § | |

**DECLARATION OF ALEJANDRO KISS IN SUPPORT OF DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY RELIEF**

I, Alejandro Kiss, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information and belief:

## INTRODUCTION

1. I am the CEO and President of Petroleum Products and Services, Inc., d/b/a Wellhead Distributors Int'l and WDi, the Chapter 11 debtor and debtor-in-possession (the "Debtor" or "WDi"). I am familiar with the day-to-day operations, business, and financial affairs of the Debtor. I am also a director of the Debtor.

2. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case (the "Bankruptcy Case") on March 4, 2016 (the "Petition Date") and in support of: (a) the Debtor's petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), filed in the United States Bankruptcy Court for the Southern District of Texas, and (b) the relief requested in the emergency motions and applications filed by the Debtor on the Petition Date (collectively, the "First Day Motions").

3. The First Day Motions seek relief intended to preserve the value of the Debtor and maintain continuity of operations by, among other things, (i) preserving the Debtor's relationships with their customers, vendors, suppliers, and employees, some of which are located in jurisdictions outside the United States; (ii) ensuring continued employee morale; (iii) maintaining the Debtor's cash management systems and other business operations without interruption; and (iv) establishing certain administrative procedures to facilitate an orderly transition into, and uninterrupted operations throughout, this Chapter 11 Case. This relief is critical to the Debtor's restructuring efforts.

4. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my discussion with other members of the Debtor's management, information provided to me by employees working under my supervision, or my opinion based upon experience, knowledge and information concerning the operations of the Debtor, and the oil and gas industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtor.

5. I founded the Debtor in 1995, and I am employed in the Debtor's offices located in Houston, Texas. I have more than 20 years of experience in the oil and gas industry, including serving as President of the Debtor since 1995.

## BACKGROUND

A. History of the Debtor.

6. The Debtor began its business in 1995 as a single location in Houston, Texas as the first wholesale distributor of API-6A wellhead equipment and valves in North America. The API-6A is an international standard that specifies requirements and gives recommendations for

the performance, dimensional and functional interchangeability, design, materials, testing, inspection, welding, marking, handling, storing, shipment, purchasing, repair and remanufacture of wellhead and christmas tree equipment used in the petroleum and natural gas industries. To satisfy wider range of customer needs, WDi expanded its product line to include high pressure, engineered wellhead systems and specialty valves and its services to include manufacturing, assembly, design and aftermarket repair capabilities. WDi offers a full suite of wellhead equipment, gate valves, mud valves, chokes and multi-bowl wellhead systems. WDi serves independent wellhead service companies and original equipment manufacturers ("OEMs") operating in the upstream oil and gas industry through its multiple stocking locations in the United States. To support customers across the United States, WDi opened and maintained strategic locations in Texas, Louisiana, California, Pennsylvania, New Mexico, Oklahoma and Arkansas.[1]

7.    From 2010 to 2013, the Debtor's financial results were strong and revenues approached $100,000,000 million a year.

8.    Starting in the summer of 2014, oil prices began to decline precipitously. Over the next six months or so, the price of oil was cut in half, then in late 2015 and early 2016 the price of oil went below $30 a barrel, which is less than a third of the price of only 19 months prior, when it was $105 per barrel. The rapid and unexpected decline in oil prices led to a significant decline in demand for oilfield equipment and services as the Debtor's customers implemented severe reductions in capital spending. The reduced demand has been compounded by an oversupply of oilfield equipment and parts. The significant and sustained drop in oil prices and related contraction of demand for wellhead equipment and services, coupled with certain unfortunate and unforeseeable events related to the disruption of Debtor's supply chain and

---

[1] A non-debtor Canadian subsidiary operates to provide similar goods and services in Canada.

resulting litigation, caused uncertainty regarding the Debtor's short-term financial viability. As a result of the economic circumstances and disruption of the Debtor's supply chain, the Debtor's total revenue for 2014 was approximately $67 million and in 2015 it dropped to just over $26 million. The state of the economy for the oil field service business is the primary reason that WDI has filed this bankruptcy.

B. Reducing Litigation Costs.

9. The failure of the oil economy has also impaired WDI's ability to litigate lawsuits that are filed in several different courts. The core part of that litigation concerns WDI's own former board members and co-shareholders competing against the business. As the story begins in the late 1990's WDI began purchasing its API 6A equipment (the "Equipment") from CP International, Inc. ("CPI"), which was a company, located here in Houston, Texas. During all relevant times CPI employed another company located in China named China Petroleum & Development Company ("CPTDC") for financing its acquisition of the Equipment. CPI had no manufacturing capability so it sourced the Equipment from Jiangsu Jinjia Machinery Group ("JMP") which is also located in China. WDI through its hard work established a strong market for the Equipment and CPI, CPTDC and JMP all enjoyed the benefit of that increasing marketplace. As the relationship grew a decision was finally made to sell CPTDC and JMP stock in WDi and to give them both positions on the board of directors. In the end the plan was for everyone to enjoy the fruits of our mutual success.

10. By the mid 2000's the relationship with CPTDC and JMP had matured to such an extent that CPTDC/JMP and WDi executed several documents were formalize this course of dealing. Those documents included a Trading Agreement, a Stock Purchase Agreement and an Investment Cooperation Agreement. Although the documents are the most accurate way to

explain the relationship one thing that was a hallmark of the association was an agreement that WDI would be the exclusive dealer in all sales of the Equipment. The exclusivity was essential because WDi was to be the market leader in this segment and if CPTDC/JMP could directly compete WDi would never be unable to negotiate the best prices and terms. The exclusivity placed all of the companies on common ground.

11.  I was told by Gavin Liu with CPI that the relationship was changing and that we should plan on establishing a new supply chain through Kana. When Liu later left and went to work for Kana I had no reason to doubt him as he had been my contact with CPI. Other people who had been employed with CPTDC left to work for Kana. At Liu's direction I then ordered Equipment from Kana. However, by late 2008 or early 2009 I discovered that CPTDC and JMP were not honoring the exclusive arrangement and I brought my concerns to their attention in an email. Those concerns went all the way to the top of CPTDC and JMP. In mid 2009, CPTDC and JMP eventually acknowledged that their actions had violated our agreement and we jointly executed a letter in advising all of our customers that our relationship was still strong and that we were moving forward.

12.  Although there were some instances that in hindsight would suggest that CPTDC and JMP had later resumed their competition against WDI, by all practical measurements we were being very successful. In fact, by 2012 WDI was paying considerable dividends to the shareholders and we all enjoyed the privileges of a company approaching $100MM in sales. Unbeknownst to me JMP/CPTDC had now learned enough about the API 6A market to try their own efforts. Eventually I discovered JMP Equipment in the possession of Kana that contained WDi part numbers on the outside of the crates. Perhaps the greatest indignation was that our exclusive suppliers announced, without warning, that they would cease shipping Equipment. I

immediately began efforts to establish a replacement supply chain for WDI while the CPTDC and JMP continued to compete. While JMP and CPTDC sold tens of millions of dollars of Equipment, WDI received nothing – that is the gravamen of this lawsuit.

## FINANCING HISTORY

JP Morgan Chase Bank.

13.     Throughout the Debtor's history, various lenders have loaned money to business. In 2014, JP Morgan Chase Bank provided the latest round of financing for the Debtor's business (the "Indebtedness"). On or about October 1, 2014, Debtor entered into a loan agreement and various related documents with JP Morgan Chase Bank (the "Lender") for a Revolving Loan Agreement to provide the Debtor with a Revolving Line of Credit up to $20,000,000 (the "RLOC"), a term loan in the principal sum of $4,500,000 (the "Term Loan"), a $3,000,000 interim promissory note (the "Interim Note") which could be advanced up to $3,000,000 and a first advance note in the principal sum of $559,600.00 representing the amount that was advanced under the Interim Note (the "First Advance Note") (collectively, the "Term Notes").

14.     In 2015, the Lender aggressively pursued non-monetary default provisions related to certain debt coverage ratios associated with the Indebtedness. The Debtor and the Lender entered into extensive negotiations that resulted in the parties entering into a modification and forbearance agreement (the "Forbearance Agreement"). As part of the Forbearance Agreement, I became a guarantor of the Indebtedness. As part of the consideration for my personal guarantee of the Indebtedness, the Debtor issued 1,120 shares of stock to me. In addition, as part of the Forbearance Agreement, the maximum amount of RLOC was reduced to $7 million and the

borrowing base of the eligible accounts receivables was reduced. I would never have executed the personal guaranty if I did not think that WDi would still be successful.

15. The current approximate balance of the Indebtedness is as follows:

    a. RLOC               $2.3MM

    b. Term Note        $3.8MM

## EVENTS LEADING UP TO BANKRUPTCY

A. <u>Collapse in Oil Prices.</u> Beginning at the end of 2014 the price of oil began declining that resulted in the rig count falling. Because WDI is a business that sells wellhead equipment, if companies are not drilling wells the business will suffer. In 2015, the domestic oil industry continued to slide and the news continued to look bleak. Nevertheless, and despite the falling sales in WDi, I agreed to sign a personal guaranty under the hope that the oil industry would turn around. Neither CPTDC nor JMP agreed to do anything to help JMP through this period and it was clear that I was on my own. By the time we reached 2016 our sales continued to decline and the prospect of filing bankruptcy seemed inevitable. With the Houston oil business in shambles I knew that the only hope for WDi was to get a breathing period where we could regroup.

B. <u>Reduction of the Debtor's Workforce and Operations.</u> As the economy declined I have reduced the workforce at WDi in a dramatic fashion. WDi began 2015 employing approximately 62 persons and had nine (9) locations. Throughout 2015 I reduced staff at WDi several times and continued to close locations. My efforts to cut costs were so dramatic that by February of 2016 I had even ceased taking any salary from WDi. At the time this bankruptcy case was filed, WDi vastly reduced its operations and overhead so that it can make it through this bad economy. The final staff reduction left WDi with 15 employees and 5 locations, one of which should be

closed by the end of March 2016. I believe that WDi has reduced the business operations as far as possible.

C. <u>Litigation.</u>  As discussed above, WDi sued CPI, CPTDC and JMP in State Court for violations of the agreements. In reaction to that lawsuit CPTDC sued WDI in Federal Court for a debt that if it was owed at all it is owed to CPI. WDi counterclaimed in the Federal Court for parts of the issues it had already raised in State Court. WDi also sued Kana and Surface Supply related to their purchases and sales of JMP Equipment. Other lawsuits and claims related to the operations of WDi will be addressed in this bankruptcy, including those of various former landlords of WDi.

## FIRST-DAY MOTIONS

16.     Concurrently with the filing of this Chapter 11 Case, the Debtor has filed a number of First-Day Motions. The Debtor anticipates that the Court will conduct a hearing within two or three businesses days after the commencement of the Case (the "First-Day Hearing"), during which the Court will entertain the argument of counsel with respect to the relief sought in the First-Day Motions.

17.     Generally, the First-Day Motions have been designed to meet the immediate goals of: (a) maintaining and protecting the Debtor's assets; (b) establishing procedures for the efficient administration of the case; (c) continuing the Debtor's operations during this cases with as little disruption and loss of productivity as possible; and (d) maintaining the confidence and support of vendors, customers, employees, and other key constituencies. The Debtor will also seek to conduct an expedited estimation of certain claims.

18.     I have reviewed each of the First-Day Motions, including the exhibits thereto, and I believe that the relief sought in each of the First-Day Motions is narrowly tailored to meet the

goals described above and, ultimately, will be critical to the Debtor's ability to achieve success in the Chapter 11 Case.

19. The First-Day Motions are identified and more fully described below[2].

A. *EMERGENCY MOTION OF THE DEBTOR FOR ORDER EXTENDING TIME TO FILE SCHEDULES AND STATEMENTS*

20. Pursuant to this motion, the Debtor seeks the entry of an order extending the time within which it must file its schedules of assets and liabilities, lists, and statements of financial affairs (collectively, the "Schedules") for approximately (30) days from the current deadline, without prejudice to the Debtor's right to request further extensions should the need arise.

21. The Debtor submits that cause exists sufficient to extend its time to file the Schedules in view of the facts and circumstances of this case. Due to the nature of the bankruptcy filing, and the fact that the Debtor now employs a substantially reduced workforce, the Debtor has not yet had sufficient time to collect and assemble all of the requisite financial data and other information and to prepare all of the Schedules required by the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

22. The Debtor's Chapter 11 petition was accompanied by, inter alia, (a) resolutions authorizing the filing of such petition, (b) a list containing the names and addresses of the Debtor's twenty (20) largest unsecured creditors, excluding insiders, (c) a Corporate Ownership Statement for the Debtor, and (d) a creditor matrix containing the name and address of all of the Debtor's creditors.

23. To that end, the Debtor has already begun and will continue to work diligently to compile the information necessary to complete the Schedules. Specifically, the Debtor must

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the relevant First-Day Motion.

gather information from various documents, sources, and locations and complete the posting of their books and records as of the Petition Date or other dates, as appropriate. Then the Debtor must review that information and prepare and verify the Schedules. Given the critical matters with which the Debtor has been and is currently dealing with, and the reduction of the workforce, the Debtor does not believe that it will have sufficient time to complete preparation of the Schedules within the fourteen (14) days required by Bankruptcy Rule 1007(c). The Debtor therefore believes that it will need approximately an additional thirty (30) days to prepare and file the Debtor's Schedules.

24. The narratives and data incorporated into the Chapter 11 Petition and the exhibits attached thereto provide creditors and parties-in-interest with a substantial amount of information about the Debtor and its financial affairs. Additionally, upon reasonable request, the Debtor will provide parties-in-interest with material information concerning its business and financial affairs, including information that will be contained in the Schedules, as such information becomes available.

B. *EMERGENCY MOTION OF THE DEBTOR FOR ORDER (1) AUTHORIZING DEBTOR TO PAY CERTAIN PRE-PETITION EMPLOYEE WAGES, BENEFTIS, WITHHOLDING OBLIGATIONS, AND (2) DIRECTING BANKS TO HONOR RELATED PRE-PETITION TRANSFERS*

25. In order to enable the Debtor to retain its current employees (the "Employees") during this critical time, minimize the personal hardship such Employees may suffer if pre-petition employee-related obligations are not paid when due, or honored as expected, and maintain morale, the Debtor, by this motion, are seeking authority, in their discretion, to pay and/or honor, as the case may be, (a) certain pre-petition claims of Employees, including, but not limited to, claims for wages, salaries, commissions, vacation, sick leave, 401(k) plan contributions, and unpaid reimbursable expenses and certain costs and disbursements related to

the foregoing (collectively, the "Employee Compensation"), up to the statutory cap of $12,475 per Employee, and (b) all pre-petition federal and state withholding obligations. The Debtor further requests that the Court enter an order directing all banks to honor the Debtor's pre-petition checks or electronic transfers for payment of the foregoing, and prohibiting banks from placing any holds on, or attempting to reverse, any automatic transfers on account of the foregoing.

26.     The Employees are essential to the continued operation of the Debtor's business and the Employees' morale directly affects their effectiveness and productivity. Consequently, it is critical that the Debtor continue, in the ordinary course, those personnel policies, programs, and procedures that were in effect prior to the Petition Date. If the checks issued and electronic fund transfers requested in payment of any of the compensation or other Employee obligations are dishonored, or if such obligations are not timely paid post-petition, the Employees may likely suffer extreme personal hardship and may be unable to pay their daily living expenses. A loss of employee morale and goodwill at this crucial juncture would undermine the Debtor's stability, and undoubtedly would have a negative effect on the Debtor, the estate, the Debtor's customers, the value of its assets and business, and its ability to achieve its objectives in Chapter 11.

C. *MOTION OF THE DEBTOR FOR ORDER (1) AUTHORIZING MAINTENANCE OF BANK ACCOUNTS AND CONTINUED USE OF EXISTING BUSINESS FORMS AND CHECKS, (2) APPROVING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM, (3) WAIVING CERTAIN INVESTMENT AND DEPOSIT GUIDELINES, AND (4) GRANTING RELATED RELIEF*

27.     The Debtor operates a consolidated cash management system which is described in this motion. As set forth therein, the system builds in efficiencies that should be preserved during the Chapter 11 Case for the benefit of the secured parties as well as to keep costs and administration to a minimum, which will benefit all creditors.

28. By the motion, the Debtor seeks an order: (a) authorizing the continued use of the Debtor's existing bank accounts and continued use of existing business forms and checks; (b) continued use of the existing cash management system; (c) waiving investment and deposit guidelines of Section 345 of the Bankruptcy Code and the United States Trustee's Guidelines; and (d) providing any additional relief required in order to effectuate the principal relief sought in the motion. The relief requested will help ensure the Debtor's smooth transition into Chapter 11 and avoid the possible disruptions and distractions that could otherwise divert the Debtor's attention from more pressing matters during the initial days of this Chapter 11 case. A chart listing each financial institution and bank account is included with the motion.

D. *EMERGENCY MOTION OF THE DEBTOR PURSUANT TO SECTIONS 105(A), 361, 362, 363, AND 552 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(B) FOR ENTRY OF INTERIM AND FINAL ORDERS (1) AUTHORIZING USE OF CASH COLLATERAL, (2) GRANTING REPLACEMENT LIENS, (3) AUTHORIZING THE DEBTOR TO INCUR POST-PETITION INDEBTEDNESS AND (4) SCHEDULING A FINAL HEARING*

29. Pursuant to this motion, the Debtor is seeking authority for the use of Cash Collateral and to grant to the Lender adequate protection for claims arising from the diminution of value of their respective collateral from the Debtor's use of the Cash Collateral.

30. Here, it is essential to the Debtor's post-petition operations, the maintenance of the value of its businesses that it use the Cash Collateral. The Cash Collateral will only be used to pay for expenses that are set forth in a budget attached to the motion. Such expenses include, but are not limited to, employee payroll and other benefits, rent on leased equipment or office space, corporate overhead, supplies, various reorganizational expenses, and other expenses related to operating the Businesses. In addition, I have agreed to provide unsecured debtor-in-possession financing up to $500,000.00 (the "DIP Financing Agreement") pursuant to the terms

of the motion and promissory note attached to the motion. The DIP Financing Agreement will be used to help fund the Debtor's operation, as necessary, during the next six to nine months.

31.     The Debtor is in the process of negotiating a budget (the "Budget") with the Lender that will show the Debtor's projected expenditures during the period from the Petition Date through March 18, 2016 (the "Budget Period"), and estimate the period in which such cash expenditures will either need to be paid or accrue. At this time, the Debtor anticipates that cash and receipts from operating the Business, along with funds available under DIP Financing Agreement, will be sufficient to satisfy the disbursements reflected in the Budget. After entry of a final order authorizing the use of Cash Collateral, and the expiration of the Budget, the Debtor will submit additional, amended, and/or supplemental Budgets for periods occurring after the Budget Period.

32.     The reasons supporting the Debtor's use of Cash Collateral are compelling. As the Debtor has extremely limited funds, use of Cash Collateral is required to fund the day-today operating expenses of the business, including payments to employees, purchase of supplies, as well as reorganizational expenses necessary to maintain the value of the business. Unless this Court authorizes use of the Cash Collateral, the Debtor will be unable to pay for services and expenses necessary to preserve and maximize the value of the Debtor's business and its bankruptcy estate. Indeed, absent sufficient funds to support the business, the Debtor will have to close other facilities, and the ability of the Debtor to provide strategic services and goods to its customers will be eliminated, which will cause the Debtor's assets to quickly erode. Therefore, authorization to use Cash Collateral pending the Final Hearing is in the best interests of the Debtor's bankruptcy estate and creditors.

33. In exchange for the use of Cash Collateral, as adequate protection for the use of the Cash Collateral, but only to the extent of the actual diminution in value of the pre-petition Collateral, the Debtor proposes to grant to the Lender replacement liens in the form of security interests and liens upon the same types and kinds of assets upon which it held a prepetition lien, subject only to valid, perfected, and enforceable prepetition liens (if any) which are senior as of the Petition Date, as well as an additional lien upon the Debtor's post-petition accounts and accounts receivables. The grant of replacement liens will only apply to the extent that the pre-petition Collateral was encumbered by valid and perfected liens and security interests (collectively, the "Replacement Liens"). The Replacement Liens will not attach to any avoidance actions under Chapter 5 of the Bankruptcy Code.

E. *EMERGENCY MOTION OF THE DEBTOR FOR AUTHORITY TO PAY CERTAIN SALES, USE AND FRANCHISE TAXES AND FEES*

34. Pursuant to this motion, the Debtor is seeking authority to pay certain sales, use and franchise taxes as they come due, regardless of whether liability for such claims arise prior to or after the Petition Date. Although the Debtor believes it is generally current on all such tax payments, some of these taxes are normally paid in arrears. As explained in the motion, the Debtor believes it is in the best interest of the Debtor, the estate and the creditors, that the Court approve this motion.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: March 4, 2016

_____
Alejandro Kiss

{851257-00008 TJJ 3/3/2016 01037388.DOCX 1 }